1
2
3
4
5
6
7
8

9          **IN THE UNITED STATES DISTRICT COURT**

10        **FOR THE EASTERN DISTRICT OF CALIFORNIA**

11

12    MARTAIN M. JORDAN,                          CASE NO. CV F 05-1450 LJO

13                      Plaintiff,          _____  **DECISION ON SOCIAL SECURITY**
                                                            **COMPLAINT**
14            vs.                                           (Docs. 20-22.)

15    JO ANNE B. BARNHART,
      Commissioner of Social
16    Security,

17                      Defendant.
                                        _____/
18

19                                  **INTRODUCTION**

20          Plaintiff Martain M. Jordan ("plaintiff") seeks this Court's review of an administrative law

21    judge's ("ALJ's") decision that plaintiff is neither disabled nor entitled to Supplemental Security Income

22    ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1382c.  Pursuant to 28 U.S.C.

23    § 636(c) and F.R.Civ.P. 73, the parties agreed to proceed before a United States Magistrate Judge, and

24    by a March 3, 2006 order, this action was assigned to United States Magistrate Judge Lawrence J.

25    O'Neill for all proceedings.  Based on review of the Administrative Record ("AR") and the papers of

26    plaintiff and defendant Jo Anne B. Barnhart, Commissioner of Social Security ("Commissioner"), this

27    Court DENIES plaintiff's request to reverse the Commissioner's decision and to award plaintiff SSI

28    benefits.

                                              1

## BACKGROUND

### Plaintiff's Personal Background

Plaintiff is age 43, completed one year of college, and lacks past relevant work. (AR 26, 98, 119, 159, 181, 344.) Plaintiff had received SSI prior to his March 1999 incarceration. (AR 150.)

### Administrative Proceedings

On July 23, 2001, plaintiff filed his SSI application to claim disability since October 19, 1992 based primarily on mental illness. (AR 26, 98, 113.) With its October 23, 2001 Notice of Disapproved Claims, the Social Security Administration ("SSA") denied plaintiff's claim and determined that plaintiff's condition is not severe enough to prevent him to work. (AR 82.) On December 12, 2001, counsel was appointed for plaintiff. (AR 53.) On December 14, 2001, plaintiff filed his Request for Reconsideration to claim he is "too disabled to work." (AR 86.) With its February 8, 2002 Notice of Reconsideration, SSA again denied plaintiff's claim and determined that plaintiff's condition is not severe enough to prevent him to work. (AR 87.)

On February 28, 2002, plaintiff filed his Request for Hearing by Administrative Law Judge to claim his is "too disabled to work." (AR 91.) After a July 30, 2002 hearing, the ALJ issued his August 14, 2002 decision to find that plaintiff is not disabled and that plaintiff has the residual functional capacity to perform work at any physical exertion level but is limited to simple, repetitive tasks with no frequent public interaction. (AR 73, 75.) On October 10, 2002, plaintiff filed with SSA's Appeals Council a Request for Review of Hearing Decision/Order to claim that the ALJ's decision was not based on substantial evidence. (AR 94.) With its September 24, 2003 order, the Appeals Council vacated the August 14, 2002 ALJ decision and remanded the case to the ALJ to "[o]btain evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base." (AR 80.) The Appeals Council directed the ALJ to identify and resolve conflicts between the vocation expert's occupational evidence and information in the Dictionary of Occupational Title ("DOT") "before relying on the vocational expert evidence." (AR 80.) Since plaintiff had filed another SSI application on April 30, 2003, the Appeals Council required the ALJ to "associate the claim files and issue a new decision on the associated claims." (AR 81.)

After an October 14, 2004 hearing, the ALJ issued his January 20, 2005 decision to find that

1  plaintiff has the residual functional capacity to perform simple repetitive tasks involving no public

2  interaction and is able to perform work existing in significant numbers in the regional economy.  (AR

3  28, 29.)  On March 7, 2005, new counsel was appointed for plaintiff who filed a Request for Review of

4  Hearing Decision/Order with the Appeals Council.  (AR 18, 20.)  On September 23, 2005, the Appeals

5  Council denied plaintiff's request for review to render the ALJ's January 20, 2005 decision subject to

6  this Court's review.  (AR 6.)

7  **Medical History And Records Review**

8  ***California Department Of Corrections***

9        During his California Department of Corrections ("CDC") incarceration, plaintiff received

10  mental health treatment.  In October 1999, plaintiff complained of anxiety.  (AR 239, 240.)  On July 27,

11  2000, plaintiff was assessed with a 65 Global Assessment of Functioning ("GAF").  (AR 233.)  On

12  September 26, 2000, plaintiff was assessed with schizophrenia – paranoid rule out.  (AR 232.)  On

13  October 18, 2000, staff psychiatrist E. Larson, M.D. ("Dr. Larson") found "no psychiatric illness" and

14  surmised plaintiff had a "secondary reason" for medications.  (AR 231.)  On November 22, 2000, Dr.

15  Larson noted that plaintiff "continues to be clear and coherent" with "no signs or authentic symptoms

16  of schizophrenia."  (AR 229.)  Dr. Larson noted that plaintiff "stressed SSI" and "wants" SSI.  (AR 229,

17  230.)

18        On January 10, 2001, Dr. Larson noted that plaintiff "has family for whom he can work" and "no

19  overt signs or symptoms of mental illness."  (AR 227.)  On January 24, 2001, staff psychologist J. Olson,

20  Psy.D. ("Dr. Olson"), diagnosed rule out delusional disorder vs. rule out schizophrenia.  (AR 224.)  On

21  February 9, 2001, plaintiff reported "no mental health concerns" and was attributed to say: "At this time

22  I'm under medications so I'm alright."  (AR 213.)  Plaintiff was assessed with a 65 GAF, rule out

23  psychotic disorder, not otherwise specified, versus rule out factitious disorder, and generalized anxiety

24  disorder, provisional.  (AR 214.)  February and 2001 notes reflect the absence of mental health

25  issues/concerns for plaintiff to discuss.  (AR 206, 208, 210.)  March 3, 2001 notes reflect that plaintiff

26  had no complaints, believed that medications were helping, was not bothered by voices, and was stable

27  on medications. (AR 235.)  Plaintiff was diagnosed with schizophrenia and paranoid chronic. (AR 237.)

28  On March 13, 2001, plaintiff was assessed with mood disorder not otherwise specified and psychosis

3

not otherwise specified. (AR 204.) On March 24, 2001, plaintiff reported that he continued to hear voices to a lesser extent but could not understand what the voices told him. (AR 200.) Plaintiff was assessed with rule out chronic paranoid schizophrenia and stable on medications. (AR 200.) On April 30, 2001, plaintiff was assessed with psychosis not otherwise specified. (AR 199.) June and July, 2001 notes reflect the absence of hearing voices and much less depression. (AR 195, 196.) Plaintiff was assessed with psychosis not otherwise specified and rule out chronic paranoid schizophrenia. (AR 196.) Plaintiff was noted as stable on his medications. (AR 195.)

A July 6, 2004 Parole Outpatient Clinic evaluation noted, as to a mental status examination, plaintiff's mild anxiety, depressed mood, restricted affect, normal speech, intact memory and increased auditory hallucinations and that plaintiff was cooperative and oriented. (AR 329.) Plaintiff was diagnosed with major depression, single, severe with psychotic features and cocaine dependence. (AR 329.)

### *Turning Point Of Central California And Jorge A. Urbina, Treating Psychiatrist*

After his summer 2001 release from prison, plaintiff received mental health treatment through Turning Point of Central California. On August 23, 2001, psychiatrist Diane W. Kecskes, M.D. ("Dr. Kecskes"), noted the absence of active delusions and assessed plaintiff with schizophrenia and depressive disorder not otherwise specified. (AR 244, 272, 283.) On January 29, 2002, Dr. Kecskes diagnosed schizophrenia chronic paranoid and depressive disorder not otherwise specified. (AR 271, 282.) On April 11, 2002, psychiatrist Jorge A. Urbina, M.D. ("Dr. Urbina"), diagnosed schizophenia paranoid type and generalized anxiety disorder. (AR 270, 281.) On May 14, 2002, plaintiff complained of anxiety but noted he was not hearing voices "that much." (AR 269, 280.) Dr. Urbina diagnosed schizophenia paranoid type and generalized anxiety disorder. (AR 269.) On July 2, 2002, plaintiff complained of feeling nervous and hearing sometime whispering voices. (AR 268.) Notes reflect "smelling alcohol!" (AR 268, 279.) Dr. Urbina diagnosed schizophenia paranoid type and generalized anxiety disorder. (AR 268, 279.) On August 15, 2002, plaintiff complained of anxiety but noted that medication helped for hearing voices and paranoia. (AR 278.)

On January 2, 2003, Dr. Urbina attributed plaintiff to state: "Not as depressed but I feel down sometime." (AR 277.) On January 30, 2003, plaintiff noted he was well with medications. (AR 276.)

1    On May 6, 2003, plaintiff reported anxiety after running out of medication.  (AR 275.)  On June 5,

2    2003, plaintiff again reported he was fine with medication.  (AR 274.)  On August 14, 2003, plaintiff

3    noted that he "kind of hears the voices" and stays home most of the time.  (AR 292.)  On September 11,

4    2003, plaintiff noted he was "a little nervous" and "still hear[s] a little bit of the voices."  (AR 291, 325.)

5    On October 14, 2003, plaintiff noted that he was "a little down" and "nervous all the time," stays home

6    most of the time watching television, and experienced on and off good and bad moods.  (AR 324.)  On

7    December 18, 2003, plaintiff reported that he was depressed, anxious and paranoid, heard voices and

8    stayed home most of the time.  (AR 323.)  During 2003, Dr. Urbina continued his diagnosis of

9    schizophenia paranoid type and generalized anxiety disorder.  (AR 274- 277, 291, 292, 294, 323, 324.)

10    Dr. Urbina completed a September 25, 2003 Complete Medical Report (Mental) to note his

11    clinical findings that plaintiff is attentive and cooperative and has soft, slow speech, productive stream

12    of thought, poor attention and concentration, and mildly depressed mood with restricted affect.  (AR

13    294.)  Dr. Urbina noted his treatment of psychotropic medications (antidepressant, anti-psychotic and

14    anti-anxiety) and fair prognosis.  (AR 294.)  Dr. Urbina checked boxes that plaintiff has fair ability to

15    follow work rules and to function independently and poor ability to relate to coworkers, to deal with

16    public and work stress, to use judgment, and to maintain attention/concentration.  (AR 295.)  As to

17    making performance adjustments, Dr. Urbina checked boxes that plaintiff has fair ability to understand,

18    remember and carry out simple job instructions and poor ability to understand, remember and carry out

19    complex and detailed job instructions.  (AR 296.)  Dr. Urbina commented that plaintiff's "stream of

20    thought and information processing may be impaired by delusional content and auditory hallucinations."

21    (AR 296.)  Dr. Urbina checked boxes that plaintiff has poor ability to behave in an emotionally stable

22    manner, to relate predictably in social situations and to demonstrate reliability based on a history or

23    spousal abuse and assaultive behavior.  (AR 296.)

### Robin R. May, M.D., Consultative Psychiatrist

25    Psychiatrist Robin R. May, M.D. ("Dr. May"), conducted a September 2, 2001 psychiatric

26    evaluation of plaintiff.  (AR 246.)  Plaintiff's chief complaint was hearing voices and anxiety and

27    schizophrenia problems.  (AR 246.)  Plaintiff reported that he sleeps well, has good appetite, is hopeful

28    about the future and has neither suicidal nor homicidal ideation.  (AR 247.)  Plaintiff stated that he no

1   longer experienced psychotic symptoms, including auditory or visual hallucinations, ideas of reference,

2   thought withdrawal or insertion.  (AR 247.)  Plaintiff noted that he had been jailed at least five times,

3   most recently for 30 months for spousal abuse and traffic violations.  (AR 247.)  Plaintiff further noted

4   his daily activities of generally watching television and helping with household chores and shopping.

5   (AR 248.)  Dr. May noted plaintiff's normal speech, fair insight, and slightly impaired judgment.  (AR

6   248.)  Dr. May diagnosed schizophrenia, rule out schizoaffective disorder, depressed type, and rule out

7   anxiety disorder, not otherwise specified.  (AR 249.)  Dr. May found plaintiff able to maintain attention

8   and concentration, to carry out one or two step simple job instructions, and to relate and interact with

9   coworkers, supervisors and the general public.  (AR 249.)  Dr. May found plaintiff unable to carry out

10   an extensive variety of technical and/or complex instructions.  (AR 249.)

11   ### *Charles House, Ph.D., Consultative Psychologist*

12   Psychologist Charles House, Ph.D. ("Dr. House"), conducted a May 13, 2004 comprehensive

13   mental status evaluation/psychological examination.  (AR 314.)  Plaintiff complained of schizophrenia,

14   anxiety and depression and acknowledged he had been jailed five or six times for fighting and terrorist

15   threats and most recently spent 30 months in prison for spousal abuse and traffic violations.  (AR 314,

16   315, 316.)  Plaintiff claimed to hear voices which were lessened with Zyprexa and to experience visual

17   hallucinations.  (AR 315.)  Plaintiff noted his daily activities of helping his mother clean up and caring

18   for his children and his pleasures of exercise, church and television watching.  (AR 316.)

19   Dr. House's mental examination revealed plaintiff's alert, responsive and socially appropriate

20   general appearance, normal productive speech, average vocabulary, paranoid ideation, mildly elevated

21   mood, visual and auditory misperceptions partially controlled with Zyprexa, fair insight and judgment,

22   average intellectual level, and impaired memory functions and social problem solving.  (AR 316-318.)

23   Dr. House noted cognitive impairment and thought disorder which "are symptomatic reflections of a

24   markedly severe psychiatric disorder."  (AR 318.)  Dr. House noted plaintiff's inability to maintain

25   adequate concentration, persistence and pace and difficulty to: (1) perform simple, repetitive tasks and

26   more complex, detailed tasks; (2) accept supervision; (3) interact appropriately with coworkers and

27   general public; (4) maintain regular work attendance; and (5) complete a normal work day without

28   causing significant workplace disruption.  (AR 318-319.)  Dr. House diagnosed schizophenia, paranoid

type.  (AR 318.)  Dr. House's prognosis for schizophrenic disorder is "guarded" in that plaintiff "will not likely demonstrate significant symptomatic improvement over the next 12 months."  (AR 318.)

### *Non-Examining Physicians*

Psychiatrist Archimedes Garcia, M.D. ("Dr. Garcia"), a California Disability Determination Services ("DDS") physician, completed an October 19, 2001 Mental Residual Functional Capacity Assessment to conclude that plaintiff is generally not significantly limited in understanding and memory, sustained concentration and persistence, social interaction and adaptation.  (AR 250-251.)  Dr. Garcia noted that plaintiff is able to maintain concentration to sustain simple, repetitive tasks, to relate to others and to adapt.  (AR 252.)

Dr. Garcia completed an October 19, 2001 Psychiatric Review Technique to note the presence of psychosis as a medically determinable impairment which does not precisely satisfy diagnostic criteria.  (AR 257.)  Dr. Garcia noted plaintiff's mild difficulties in daily living activities and maintaining concentration, persistence or pace and moderate difficulties in maintaining social functioning.  (AR 265.)  DDS physician Glenn Ikawa, M.D. ("Dr. Ikawa"), affirmed Dr. Garcia's assessment.  (AR 255.)

DDS physician Allen Middleton, Ph.D. ("Dr. Middleton"), completed a July 14, 2003 Mental Residual Functional Capacity Assessment to conclude that plaintiff generally is not significantly limited in understanding and memory, sustained concentration and persistence, social interaction and adaptation.  (AR 284-285.)  Dr. Middleton noted that plaintiff is able to perform simple, repetitive tasks with adequate pace and persistence and to adapt and should have limited contact with coworkers and general public.  (AR 286.)

Dr. Middleton completed a July 14, 2003 Psychiatric Review Technique to note the presence of decreased sleep, nervousness, schizophrenia chronic paranoid, and generalized anxiety as medically determinable impairments which do not precisely satisfy diagnostic criteria.  (AR 300, 303.)  Dr. Middleton noted plaintiff's moderate to mild difficulties in daily living activities and maintaining social functioning and concentration, persistence or pace.  (AR 308.)  DDS physician Evelyn Aquino-Caro, M.D., affirmed Dr. Middleton's assessment on October 24, 2003.  (AR 298.)

### *Medications*

Plaintiff's medications have included Zyprexa 5 mg, Zanax 4 mg, Wellbutrin 150 mg, Buspirone

1    HCL 15 mg, Risperdal 3 mg, Vistaril 50 mg, and Clonazepam.  (AR 118, 146, 159.)

2                              **Plaintiff's Activities And Testimony**

3                                  *Reports And Questionnaires*

4          Plaintiff completed a July 1, 2003 Disability Report Adult to claim that his mental illness,

5    schizophrenia and anxiety limit his ability to work but that he is able to function under medications.

6    (AR 113.)  Plaintiff had received SSI prior to his incarceration and claims his "condition still exists and

7    may have worsened."  (AR 120.)

8          Plaintiff's mother completed an August 6, 2001 Daily Activities Questionnaire (Third Party

9    Information) to note that plaintiff cooks, irons, uses public transportation, and watches television five

10   to six hours a day (AR 127, 128.)

11         Plaintiff completed an August 7, 2001 Daily Activities Questionnaire to note that on a typical

12   day, he rests.  (AR 132.)  Plaintiff experiences no sleep difficulties with Zyprexia.  (AR 132.)  Plaintiff

13   prepares meals, shops for groceries and clothes, performs household chores (cleaning, laundry, ironing

14   and maintenance), and rides a bus to his appointments (AR 133, 134.)  Plaintiff has no difficulties to get

15   along with family, friends, coworkers or others.  (AR 135.)  Plaintiff is forgetful and had difficulty to

16   concentrate on instructions.  (AR 136.)  Plaintiff claims he is unable to work because of inability to focus

17   and drowsiness from medication.  (AR 136.)

18         Plaintiff completed a May 28, 2003 Disability Report – Adult to claim inability to work since

19   January 1, 1992 due to mental illness, hearing voices and anxiety.  (AR 155, 156.)

20         California Parole Agent R. Butler completed a May 29, 2003 Parole Agent Questionnaire to note

21   that plaintiff complies with his parole.  (AR 164.)

22         Plaintiff completed a June 5, 2003 Daily Activities Questionnaire to describe an average day as

23   "medicated and sedated all the time."  (AR 175.)  Plaintiff cooks once a day, shops once a month, and

24   performs no household chores. (AR 176.)  Plaintiff claims that he experiences motivation problems and

25   difficulties to get along with others, to think on a subject, to finish a task or chore, and to understand

26   instructions. (AR 175, 177-179.)  Plaintiff claims that sedation from medication prevents him to work.

27   (AR 179.)

28         Plaintiff's mother completed a June 5, 2003 Function Report Adult – Third Party to note that

1    plaintiff is "always medicated" and lives in an apartment with his girlfriend who assists with his personal

2    care and meals.  (AR 167-169.)  Plaintiff "has a problem paying attention," is unable to follow written

3    or spoken instructions or to handle stress, and becomes frustrated.  (AR 171, 172.)  Plaintiff "is pretty

4    much isolated and sedated."  (AR 173.)

5         In an August 25, 2003 Reconsideration Disability Report, plaintiff noted changed symptoms of

6    hearing voices, seeing things, difficulty to concentrate, sleepiness from medications, and inability to

7    drive and work due to mental illness.  (AR 189.)

8                    ***Plaintiff's July 30, 2002 ALJ Hearing Testimony***

9         Plaintiff testified at the July 30, 2002 ALJ hearing that he is unable to work because of

10   medications and his mental health status, including paranoid schizophrenia, anxiety disorder and

11   depression.  (AR 334.)  Plaintiff takes medication to prevent hearing voices and for anxiety and

12   nervousness which increases around crowds.  (AR 334.)  Plaintiff feels nervous most of the day, and his

13   medication calms his nerves and makes him dizzy, lightheaded drowsy and to "sleep all the time."  (AR

14   334, 337, 341.)

15        Plaintiff lives in an apartment by himself.  (AR 335.)  On a typical day, plaintiff takes his

16   medication and "mostly" sleeps up to three quarters of the day.  (AR 335.)  Plaintiffs gets up in the

17   morning, showers, eats and lies down.  (AR 336.)  A friend comes in and helps plaintiff to clean and

18   cook because plaintiff is under medication.  (AR 336.)  Plaintiff "just" sits and watches television

19   "basically."  (AR 338.)

20        Plaintiff hears voices an hour or two in the morning and at night.  (AR 338.)  Plaintiff is unable

21   to block out the noises.  (AR 338.)

22        Plaintiff was released from prison on July 22, 2001 after a 29-month sentence for spousal abuse,

23   domestic violence.  (AR 339.)  In prison, plaintiff received mental health treatment of medication and

24   counseling.  (AR 339.)  Since his prison release, plaintiff sees monthly a psychiatrist who prescribes

25   medication and performs counseling.  (AR 339, 340.)

26        Plaintiff has difficulty to concentrate to require him read something several times.  (AR 340.)

27   Plaintiff estimates that he is able to concentrate for 15-30 minutes.  (AR 340.)

28        Plaintiff first received SSI in 1992 or 1994 due to paranoid schizophrenia.  (AR 342.)

***Plaintiff's October 14, 2004 ALJ Hearing Testimony***

At the onset of the October 14, 2004 ALJ hearing, plaintiff noted that he was not represented by counsel and was prepared to proceed without representation.  (AR 350, 351.)  Plaintiff testified that he had received SSI due to his schizophrenia, anxiety and depression and was taken off SSI when he was incarcerated.  (AR 355.)  Plaintiff twice violated his parole for which he was again incarcerated for several months.  (AR 352, 355.)  When in prison, plaintiff was housed with mental patients.  (AR 363-364.)  At the time of the hearing, plaintiff was off parole.  (AR 353.)

Plaintiff's medications cause drowsiness, and plaintiff is "knocked out most of the time."  (AR 355, 357.)  Plaintiff's treatment at Turning Point "helped me out a lot with my mental and they helped me quite a bit."  (AR 356.)  Plaintiff is unable to function without his medication in that he becomes jittery, nervous and afraid to be around people and a crowd.  (AR 358, 359.)

Plaintiff lives with his mother who helps care for plaintiff.  (AR 356.)  Plaintiff does not have a driver's license and gets around by bus.  (AR 357.)

***Vocational Expert Cheryl Chandler's October 14, 2004 ALJ Hearing Testimony***

As a hypothetical, the ALJ asked vocational expert Cheryl Chandler ("Ms. Chandler") to assume a person who: (1) is plaintiff's age; (2) has plaintiff's educational background; (3) lacks prior relevant work during the past 15 years; (4) is able to perform simple, repetitive tasks with no public interaction; and (5) lacks exertional limitations.  (AR 360-361.)  Ms. Chandler opined that a person with such limitations is able to perform jobs of farmwork (94,000 jobs in California of which 55,000 are medium, unskilled); assembler (84,000 jobs in California most of which are light, unskilled); and hand packer (45,000 jobs in California of which more than half are light, unskilled).  (AR 361, 362.)

## The ALJ's Findings

With his January 20, 2005 decision, the ALJ identified the primary issue as whether plaintiff is under a disability.  (AR 25.)  In concluding that plaintiff is not under a disability and not entitled to SSI, the ALJ found:

1.  Plaintiff has schizophrenia, paranoid type, and generalized anxiety disorder but lacks an impairment of combination of impairments listed in or medially equal to an impairment in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.

2.      Plaintiff's subjective complaints and alleged functional limitations are not as severe as asserted and are only partially credible.

3.      Plaintiff has the residual functional capacity to perform simple repetitive tasks involving no public interaction and has no exertional limitations.

4.      Because plaintiff's non-exertional limitations do not significantly compromise ability to perform work at all exertional levels, section 204.00 of the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2 ("Medical-Vocational Guidelines") indicates a finding of not disabled.

5.      Plaintiff is not disabled considering the range of work at all levels which plaintiff is able to perform functionally, in combination with his age, education and work experience, and using section 204.00 of the Medical-Vocational Guidelines as a framework. (AR 29-30.)

## DISCUSSION

### Standard Of Review

Congress has provided limited judicial review of a Commissioner's decision made through an ALJ.  *See* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . .).  A court must uphold the Commissioner's decision, made through an ALJ, when the determination is not based on legal error and is supported by substantial evidence.  *See Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985); *Sanchez v. Secretary of Health & Human Services*, 812 F.2d 509, 510 (9th Cir. 1987) (two consulting physicians found applicant could perform light work contrary to treating physician's findings).[1]  Substantial evidence is "more than a mere scintilla," *Richardson v. Perales*, 402 U.S. 389, 402, 91 S.Ct. 1420 (1971), but less than a preponderance,  *Sorenson v. Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975).  Substantial evidence "means such evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401, 91 S.Ct. 1420; *Sandgathe*, 108 F.3d at 980.

The record as a whole must be considered, weighing both the evidence that supports and detracts

---

[1]      "The district court properly affirms the Commissioner's decision denying benefits if it is supported by substantial evidence and based on the application of correct legal standards." *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997).

1  from the Commissioner's conclusion. *Sandgathe*, 108 F.3d at 980; *Jones,* 760 F.2d at 995.  If there is

2  substantial evidence to support the administrative finding, or if there is conflicting evidence that will

3  support a finding of either disability or nondisability, the finding of the Commissioner is conclusive.

4  *Sprague v. Bowen*, 812 F.2d 1226, 1229-1230 (9th Cir. 1987).  If the evidence is susceptible to more than

5  one rational interpretation, the court may not substitute its judgment for that of the Commissioner.

6  *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999); *Morgan v. Commissioner*, 169 F.3d 595, 599 (9th

7  Cir. 1999).

8       This Court reviews the ALJ's decision pursuant to 42 U.S.C. § 405(g) to determine whether it

9  is: (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a

10  whole.  *Copeland v. Bowen*, 861 F.2d 536, 538 (9th Cir. 1988).  "A decision of the ALJ will not be

11  reversed for errors that are harmless." *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

12       Plaintiff bears the burden to prove that he is disabled which requires presentation of "complete

13  and detailed objective medical reports of his condition from licensed medical professionals." *Meanel*

14  *v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999) (citing 20 C.F.R. §§ 404.1512(a)-(b), 404.1513(d)).

15  "Failure to prove disability justifies a denial of benefits." *Ukolov v. Barnhart*, 420 F.3d 1002, 1004 (9th

16  Cir. 2005); *see Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir.1995), *cert. denied*, 517 U.S. 1122, 116

17  S.Ct. 1356 (1996).  Plaintiff must furnish medical and other evidence about plaintiff's medical

18  impairments. 20 C.F.R. §§ 404.1512(a), 416.912(a); ("[Y]ou must bring to our attention everything that

19  shows that you are blind or disabled."); 20 C.F.R. §§ 404.1514, 416.914 ("We need specific medical

20  evidence to determine whether you are disabled or blind.  You are responsible for providing that

21  evidence.")

22       Plaintiff claims disability since October 19, 1992 based primarily on mental illness,

23  schizophrenia and anxiety.  (AR 26, 98, 113.)[2]

24       With the above standards in mind, this Court turns to plaintiff's criticism of the ALJ's January

25  20, 2005 decision.

26  / / /

27  _____

28  [2]        Based on his opening brief, plaintiffs appears to claim that his medications contribute to inability to focus
and concentrate and in turn to work.

### Dr. Urbina's Assessment

Plaintiff challenges the ALJ's evaluation of treating psychiatrist Dr. Urbina's residual functional capacity assessment. Plaintiff argues that the ALJ failed to provide specific, legitimate reasons to reject Dr. Urbina's assessment. The Commissioner responds that "the record contains multiple conflicting opinions as to Plaintiff's functional limitations." The Commissioner contends that the ALJ properly questioned Dr. Urbina's assessment in that "it was somewhat vague and – when interpreted as supporting Plaintiff's disability claim – internally inconsistent and inconsistent with his treatment notes."

A treating physician's opinion is not conclusive as to a claimant's condition or the ultimate issue of disability and may be disregarded by the ALJ even when it is not contradicted. *See Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992); *Rodriquez v. Bowen*, 876 F.2d 759, 761-762, n. 7 (9th Cir. 1989); *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).[3]  An ALJ may reject a treating physician's opinion whether or not it is contradicted, if the opinion is "brief and conclusory in form with little in the way of clinical findings to support its conclusion." *Magallanes,* 881 F.2d at 751. Inconsistencies and ambiguities in a treating physician's opinion regarding disability may constitute specific, legitimate reasons to reject the opinion. *Matney*, 981 F.2d at 1020.

The Ninth Circuit has further explained:

> To reject the opinion of a treating physician which conflicts with that of an examining physician, the ALJ must "'make findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record.'" . . . "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." . . . The rule . . . does not apply, however, "when the nontreating physician relies on independent clinical findings that differ from the findings of the treating physician." . . . "'[T]o the extent that [the nontreating physician's] opinion rests on objective clinical tests, it must be viewed as substantial evidence . . .'"

*Magallanes*, 881 F.2d at 751(citations omitted.)

An ALJ may reject a treating physician's report based on a claimant's exaggerated claims. *See, e.g., Sandgathe*, 108 F.3d at 980. A physician's opinion of disability "premised to a large extent upon claimant's own accounts of his symptoms and limitations" may be disregarded where those complaints

---

[3]   A treating physician's opinion is not conclusive as to claimant's disability as this ultimate issue is an administrative finding reserved to the Commissioner. 20 C.F.R. § 404.1527(e). The Commissioner has final responsibility to determine a claimant's residual functional capacity. 20 C.F.R. § 404.1546.

1    have been "properly discounted." *Fair v. Bowen*, 885 F.2d 597, 605 (9th Cir. 1989) (citing *Brawner v.*

2    *Sec. of Health & Human Servs.*, 839 F.2d 432, 433-434 (9th Cir. 1988)); *see Saelee v. Chater*, 94 F.3d

3    520, 522 (9th Cir. 1996), *cert. denied*, 519 U.S. 1113, 117 S.Ct. 953 (1997) ("no physician has been able

4    to find a link between [claimant's] complaints and known medical pathologies").

5        "The opinions of non-treating or non-examining physicians may also serve as substantial

6    evidence when the opinions are consistent with independent clinical finding or other evidence in the

7    record." *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002).

8        "[T]he ALJ is responsible for determining credibility, resolving conflicts in the medical

9    testimony, and for resolving ambiguities." *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998).

10   Inconsistencies and ambiguities in a treating physician's opinion regarding disability may constitute

11   specific, legitimate reasons to reject the opinion. *Matney*, 981 F.2d at 1020.

12       As a reminder, Dr. Urbina completed a September 25, 2003 Complete Medical Report (Mental)

13   to note his clinical findings that plaintiff is attentive and cooperative and has productive stream of

14   thought, poor attention and concentration and mildly depressed mood with restricted affect. (AR 294.)

15   Dr. Urbina checked boxes that plaintiff has fair ability to follow work rules and to function

16   independently and poor ability to relate to coworkers, to deal with public and work stress, to use

17   judgment, and to maintain attention/concentration. (AR 295.) As to making performance adjustments,

18   Dr. Urbina checked boxes that plaintiff has fair ability to understand, remember and carry out simple

19   job instructions and poor ability to understand, remember and carry out complex and detailed job

20   instructions. (AR 296.) Dr. Urbina checked boxes that plaintiff has poor ability to behave in an

21   emotionally stable manner, to relate predictably in social situations and to demonstrate reliability based

22   on a history or spousal abuse and assaultive behavior. (AR 296.)

23       The ALJ found that plaintiff "retains the residual functional capacity to perform simple repetitive

24   tasks involving no interaction with the public." (AR 28, 29.) After providing a detailed summary of the

25   facts and medical evidence, the ALJ discounted Dr. Urbina's assessment in the September 25, 2003

26   Complete Medical Report (Mental):

27       In September 2003, Dr. Urbina completed a Medical Source Statement (Exhibit 10F).
        He reported clinical findings only of poor attention and concentration and of a mildly
28       depressed mood, yet he rated the claimant as having "poor" ability in all work-related

1    characteristics except following work rules, functioning independently, performing
2    simple repetitive tasks and maintaining personal appearance, which he rated as "fair."
     However, as Dr. Urbina does not define "poor" and "fair," it is unclear how this
3    assessment of the claimant's work-related abilities translates into the residual functional
     capacity language required by the Social Security Administration.  Because of this
4    ambiguity, the Administrative Law Judge has given Dr. Urbina's opinion less weight
     than would be typically warranted.  (AR 27-28.)

5    Plaintiff relies chiefly on Dr. Urbina's brief, conclusory check-the-box responses which Dr.

6    Urbina purported to support with minimal clinical findings that plaintiff is attentive and cooperative and

7    has productive stream of thought, poor attention and concentration and mildly depressed mood with

8    restricted affect.  (AR 294.)  Such clinical findings fail to support Dr. Urbina's far reaching limitations.

9    In addition, Dr. Urbina's treatment of plaintiff is incongruent with his assessed limitations.  During 2002

10   and 2003, Dr. Urbina's treatment was chiefly monthly medication management.  (AR 268-270, 274-281,

11   291, 292, 294, 323, 324.)  On January 2, 2003, Dr. Urbina attributed plaintiff to state: "Not as depressed

12   but I feel down sometime."  (AR 277.)  On January 30, 2003 and June 5, 2003, plaintiff reported that

13   he was well with medications.  (AR 274, 276.)[4]  The ALJ properly noted plaintiff's quality response with

14   medication compliance and examining psychiatrist Dr. May's less restrictive assessment.  (AR 27.)

15   Moreover, during his incarceration, plaintiff's condition was well managed with medication, and CDC

16   staff psychiatrist Dr. Larson found "no psychiatric illness" and "no overt signs or symptoms of mental

17   illness."  (AR 195, 196, 206, 208, 210, 213, 227, 229, 231, 235.)

18   Plaintiff demonstrates no error in the ALJ's assessment of Dr. Urbina's extreme limitations in

19   his September 2003 check-the-box responses which are unsupported with his clinical findings and

20   inconsistent with treatment notes and plaintiff's statements.  The ALJ questioned plaintiff's subjective

21   complaints and alleged functional limitations to warrant further a discredit of Dr. Urbina's assessment.

22   (AR 28, 29.)  The ALJ based his discount of Dr. Urbina's assessment on solid grounds, not the "relative

23   imprecision of the psychiatric methodology or the absence of substantial documentation."  *See Sanchez*

24   *v. Apfel*, 85 F.Supp.2d 986, 992 (C.D. Cal. 2000).

25   **Dr. House's Assessment**

26   Plaintiff challenges the ALJ's assessment of consultative psychiatrist Dr. House and argues that

27
     _____

28        [4]      During his incarceration, plaintiff reported he was well with medication compliance.  (AR 206, 208, 210,
     213, 235.)

1    the ALJ's rationale to reject the assessment "is contrary to the evidence on the face of the report."  The

2    Commissioner responds that the ALJ properly rejected Dr. House's assessment in light of conflicting

3    medical opinions.

4           The Ninth Circuit Court of Appeals distinguishes opinions among physicians who treat claimants

5    (treating physicians), who examine but do not treat claimants (examining physicians), and who neither

6    treat nor examine claimants (nonexamining physicians). *Lester v. Chater*, 81 F.3d 821, 839 (9th Cir.

7    1995).  "And like the opinion of a treating doctor, the opinion of an examining doctor, even if

8    contradicted by another doctor, can only be rejected for specific and legitimate reasons that are supported

9    by substantial evidence in the record."  *Lester*, 81 F.3d at 830.  An ALJ may meet the obligation of

10   specific, legitimate reasons based on substantial evidence in the record "by setting out a detailed and

11   thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and

12   making findings."  *Magallanes*, 881 F.2d at 753; *Cotten v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986).

13   "The ALJ must do more than offer his conclusions.  He must set forth his own interpretations and

14   explain why they, rather than the doctors', are correct."  *Embrey v. Bowen*, 849 F.2d 418, 421-422 (9th

15   Cir. 1988).

16          As a reminder, Dr. House's May 13, 2004 mental examination revealed plaintiff's alert,

17   responsive and socially appropriate general appearance, normal productive speech, average vocabulary,

18   paranoid ideation, mildly elevated mood, visual and auditory misperceptions partially controlled with

19   Zyprexa, fair insight and judgment, average intellectual level, and impaired memory functions and social

20   problem solving.  (AR 316-318.)  Dr. House noted plaintiff's inability to maintain adequate

21   concentration, persistence and pace and difficulty to: (1) perform simple, repetitive tasks and more

22   complex, detailed tasks; (2) accept supervision; (3) interact appropriately with coworkers and general

23   public; (4) maintain regular work attendance; and (5) complete a normal work day without causing

24   significant workplace disruption.  (AR 318-319.)

25          The ALJ observed that Dr. House "concluded that the claimant will have difficulty in all of the

26   requisite work-related areas, yet also reported that the claimant's mental status examination was

27   essentially normal (Exhibit 12F, p. 3).  Because this opinion is thus internally inconsistent, the

28   Administrative Law Judge has give it little weight."  As noted by the Commissioner, Dr. May and the

DDS physicians reached conclusions differing from those of Dr. House.  Dr. May found plaintiff able to maintain attention and concentration, to carry out one or two step simple job instructions, and to relate and interact with coworkers, supervisors and the general public.  (AR 249.)  Dr. Garcia and Dr. Middleton concluded that plaintiff generally is not significantly limited in understanding and memory, sustained concentration and persistence, social interaction and adaptation. (AR 250-251, 284-285.) Dr. Garcia noted that plaintiff is able to maintain concentration to sustain simple, repetitive tasks, to relate to others and to adapt.  (AR 252.)  Dr. Middleton noted that plaintiff is able to perform simple, repetitive tasks with adequate pace and persistence and to adapt.  (AR 286.)  " Where evidence is susceptible of more than one rational interpretation, it is the ALJ's conclusion which must be upheld."  *Sample v. Schweiker*, 694 F.2d 639, 642 (9ᵗʰ Cir. 1982) (citing *Rhinehart v. Finch*, 438 F.2d 920, 921 (9th Cir.1971)).  "The ALJ need not substitute the judgment of expert witnesses for his own." *Sample*, 694 F.2d at 642; *cf.*, *Day v. Weinberger*, 522 F.2d 1154, 1156 (9th Cir.1975) (reason for rejection must be offered where such testimony is uncontroverted).  The ALJ properly noted internal inconsistency in Dr. House's assessment to discount it.  Dr. House's average intellectual level assessment offsets his conclusions of difficulty in work-related areas.  The ALJ properly set out a detailed summary of the facts and conflicting medical evidence, stated his interpretation thereof, and made findings.  Plaintiff fails to substantiate his criticism of the ALJ's evaluation of Dr. House's assessment.

## Vocational Expert Testimony

Plaintiff notes that the ALJ observed that plaintiff "has mild restriction of activities of daily living, moderate difficulties in maintaining social functioning and moderate difficulties in maintaining concentration, persistence or pace."  (AR 28.)  Plaintiff faults the ALJ for failing to include such limitations is a hypothetical to vocational expert Ms. Chandler.  The Commissioner responds that the ALJ's comment "was not an assessment of Plaintiff's specific functional limitations" to require the ALJ to question Ms. Chandler about the comment.

The Commissioner correctly notes that the ALJ's comment was a preliminary assessment of plaintiff's general mental functioning to assist to ascertain whether plaintiff's mental condition is severe or presumptively disabling.  *See* 20 C.F.R. § 416.920a(a) ("when we evaluate the severity of mental impairments for adults . . . we must follow a special technique at each level in the administrative review

process"). An ALJ is required to address "four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." 20 C.F.R. § 416.920a(c)(3). An ALJ is further required to discuss the functional areas. 20 C.F.R. § 416.920a(e). The Commissioner correctly points out that such ALJ assessment is not of plaintiff's functional limitations. *See* 20 C.F.R. § 416.920a(d)(3) ("If we find that you have a severe mental impairment(s) that neither meets nor is equivalent in severity to any listing, we will then assess your residual functional capacity.") Plaintiff demonstrates no ALJ error in failure to include his observation in a hypothetical.

Plaintiff appears to further criticize the ALJ for failure to include in a hypothetical to Ms. Chandler the residual functional capacity assessments of Dr. Urbina and Dr. House. The Commissioner responds that the ALJ did not need to question Ms. Chandler on Dr. Urbina and Dr. House's assessments in that the ALJ properly rejected them.

The Commissioner is correct. An ALJ may properly "limit a hypothetical to those impairments that are supported by substantial evidence in the record." *Osenbrock v. Apfel*, 240 F.3d 1157, 1165 (9th Cir. 2001). An ALJ may so limit a hypothetical even when medical evidence conflicts. *Magallanes*, 881 F.2d at 756. "An ALJ is free to accept or reject restrictions in a hypothetical question that are not supported by substantial evidence." *Osenbrock*, 240 F.3d at 1165; *see Magallanes*, 881 F.2d at 756-757. Determination of "validity of medical opinion offered" is "uniquely within the ambit of the ALJ, and the limitation of evidence contained in the hypothetical at issue would be objectionable only if the assumed facts could not be supported by the record." *Sample*, 694 F.2d at 644. The parameters of an ALJ's hypotheticals need not "include any alleged impairments that the ALJ has rejected as untrue." *Long v. Chater*, 108 F.3d 185, 188 (8th Cir. 1997). An ALJ is not bound to accept restrictions in a hypothetical question of claimant's counsel. *Martinez v. Heckler*, 807 F.2d 771, 773 (9th Cir. 1986). Here, the ALJ properly limited his hypothetical with evidence supported by substantial evidence. Plaintiff fails to demonstrate the ALJ erred to exclude Dr. Urbina and Dr. House's limitations which the ALJ properly discounted.

Plaintiff contends that in response to the ALJ's hypothetical, Ms. Chandler failed to "set forth any jobs that Plaintiff can perform as she did not name jobs with sufficient specificity . . . to evaluate

whether the job was within or outside of even the minimal limitations given by the ALJ." Plaintiff argues that without DOT citation, Ms. Chandler left "the identity of the job 'guess work.'" Plaintiff concludes that "the jobs identified by the vocational expert were insufficiently precise to constitute valid evidence of work that Plaintiff could perform." The Commissioner responds that Ms. Chandler's testimony was "superfluous" given that the Medical-Vocational Guidelines "supported the ALJ's finding that Plaintiff could perform a significant number of jobs existing in the national economy."

In the final step of the five-step disability evaluation, the Commissioner has the burden to show, in light of a claimant's residual functional capacity, he/she can engage in other substantial gainful work that exists in the national economy. *Osenbrock v. Apfel*, 240 F.3d 1157, 1162 (9th Cir. 2001). The Commissioner may meet this burden by testimony of a vocational expert or reference to the Medical-Vocational Guidelines. *Osenbrock*, 240 F.3d at 1162.

If a claimant has significant non-exertional impairments, an ALJ cannot rely on the Medical-Vocational Guidelines (also known as "grids"). *Osenbrock*, 240 F.3d at 1162. "Non-exertional limitations are limitations that do not directly affect a claimant's strength." *Buckart v. Bowen*, 856 F.2d 1335, 1340 (9th Cir. 1988). An ALJ correctly applies the Medical-Vocational Guidelines when a claimant fails to establish a significant non-exertional impairment. *Marci*, 93 F.3d at 545. If the Medical-Vocational Guidelines fail to accurately describe a claimant's limitations, an ALJ may not rely on the Medical-Vocational Guidelines alone to show the availability of jobs for the claimant and must hear testimony of a vocational expert. *Reddick v. Charter*, 157 F.3d 715, 729 (9th Cir. 1998); *Jones*, 760 F.2d at 998. When vocational expert testimony is used, the vocational expert must identify a specific job or jobs in the national economy having requirements that the claimant's physical and mental abilities and vocational qualifications would satisfy. *Osenbrock*, 240 F.3d at 1162-1163.[5]

---

[5]     The Ninth Circuit Court of Appeals has further noted:

When a claimant's non-exertional limitations are "sufficiently severe" so as to significantly limit the range of work permitted by the claimant's exertional limitations, the grids are inapplicable. *Desrosiers*, 846 F.2d at 577. In such instances, the Secretary must take testimony of a vocational expert, *Jones*, 760 F.2d at 998, and identify specific jobs within the claimant's capabilities. *Kail v. Heckler*, 722 F.2d 1496, 1498 (9th Cir. 1984). Thus, the grids will be inappropriate where the predicate for using the grids – the ability to perform a full range of either medium, light or sedentary activities – is not present.

1    In *Desrosiers v. Secretary of Health and Human Servs.,* 846 F.2d 573, 576 (9th Cir. 1988), the

2  Ninth Circuit Court of Appeals provided ALJs guidance to address claims of non-exertional limitations:

3       [T]he fact that a non-exertional limitation is alleged does not automatically preclude
        application of the grids.  The ALJ should first determine if a claimant's non-exertional

4       limitations significantly limit the range of work permitted by his exertional limitations.
        *Razey v. Heckler,* 785 F.2d 1426, 1430 (9th Cir. 1986); *Blacknall v. Heckler,* 721 F.2d

5       1179, 1181 (9th Cir. 1983); *Olde v. Heckler,* 707 F.2d 439, 440 (9th Cir. 1983).

6            The ALJ must weigh conflicting evidence concerning the claimant's past work
        experience, education, and present psychological and physical impairments.  The ALJ

7       then applies the grids to these factors, ensuring that the final determination will be both
        consistent with other similar cases and expeditious.  The claimant may challenge the

8       sufficiency of the evidence supporting the ALJ's assessment.  A non-exertional
        impairment, if sufficiently severe, may limit the claimant's functional capacity in ways

9       not contemplated by the guidelines.  In such a case, the guidelines would be inapplicable.

10           All this can be accommodated to a system of fair and expeditious disposition of
        claims by those asserting pain or other non-exertional limitations.  It is not necessary to

11      permit a claimant to circumvent the guidelines simply by alleging the existence of a non-
        exertional impairment, such as pain, validated by a doctor's opinion that such

12      impairment exists.  To do so frustrates the purpose of the guidelines.

13  *Desrosiers,* 846 F.2d at 577 (citing decisions from the Second, Fourth, Fifth, Sixth and Eighth Circuit

14  Courts of Appeals).

15    Plaintiff's mental limitations are non-exertional.  The ALJ properly found (and plaintiff fails to

16  demonstrate otherwise) that plaintiff's "nonexertional limitations did not significantly compromise

17  ability to perform work at all exertional levels." (AR 29.)  The ALJ properly limited plaintiff to simple

18  repetitive tasks with no public interaction, and such limitations did not preclude application of the

19  Medical-Vocational Guidelines, which reflect the numbers of unskilled jobs that exist throughout the

20  national economy at various functional levels (sedentary, light, medium, heavy, and very heavy)." 20

21  C.F.R. Part 404, Subpt. P, App. 2, § 200.00(b).  "Unskilled work is work which needs little or no

22  judgment to do simple duties that can be learned on the job in a short period of time."  20 C.F.R. §

23  416.968(a).  As noted by the Commissioner, plaintiff's limitation to simple repetitive work is consistent

24  with unskilled work upon which the Medical-Vocational Guidelines are based, that is, the jobs reflected

25  therein do not require more than simple, repetitive tasks.  Moreover, plaintiff's limitation of no public

26  interaction did not preclude application of the Medical-Vocational Guidelines given that "the primary

27  ────────────────

28  *Burkhart,* 856 F.2d at 1340.

1  work functions in the bulk of unskilled work relate to working with things (rather than with data or

2  people)." 20 C.F.R. 404, Subpt. P, App. 2, § 200.00(i).  Plaintiff's non-exertional limitations did not

3  preclude application of the Medical-Vocational Guidelines.

4       Alternatively, the Commissioner argues that although Ms. Chandler did not refer to the DOT,

5  her testimony is substantial evidence to support the ALJ's finding that plaintiff "remains capable of

6  performing other work existing in significant numbers in the regional economy." (AR 29.) One purpose

7  of the DOT is to classify identified job titles by their exertional and skill requirements. *Terry v. Sullivan*,

8  903 F.2d 1273, 1276 (9th Cir. 1990).  The DOT is "the Secretary's primary source of reliable job

9  information." *Terry*, 903 F.2d at 1276; 20 C.F.R. § 404.1566(d)(1).  "The DOT is not the sole source

10  of admissible information concerning jobs.  *Johnson v. Shalala*, 60 F.3d 1428, 1435 (9th Cir. 1995).

11  The Secretary may take administrative notice of any reliable job information, including the services of

12  a vocational expert. *Johnson*, 60 F.3d at 1435.  "The regulations, themselves, provide that the DOT

13  classifications are rebuttable.  They recognize vocational experts and several published sources other

14  than the DOT as authoritative." *Johnson*, 60 F.3d at 1435-1436.  "[A]n ALJ may rely on expert

15  testimony which contradicts the DOT, but only insofar as the record contains persuasive evidence to

16  support the deviation." *Johnson*, 60 F.3d at 1435.  "Introduction of evidence of the characteristics of

17  specific jobs available in the local area through the testimony of a vocational expert is appropriate, even

18  though the job traits may vary from the way the job title is classified in the DOT." *Johnson*, 60 F.3d at

19  1435.[6]

20       Ms. Chandler properly discussed unskilled California jobs with no public contact.  (AR 361,

21  362.)  The Ninth Circuit has explained that "expert testimony may properly be used to show that the

22  particular jobs . . . may be ones that a particular claimant can perform.  In fact it seems an eminently

23  appropriate use of the vocational expert's knowledge and experience." *Johnson*, 60 F.3d at 1435.

24  Plaintiff fails to demonstrate ALJ error in application of the Medical-Vocation Guidelines or use of

25  vocational expertise.

26  / / /

27  

28      [6]   The DOT provides: "DOT users demanding specific job requirements should supplement this data with local information detailing jobs within their community."  DOT at xiii.

## CONCLUSION AND ORDER

For the reasons discussed above, this Court finds no error in the ALJ's analysis and that the ALJ properly concluded that plaintiff is not disabled.  This Court further finds the ALJ's decision is supported by substantial evidence in the record as a whole and based on proper legal standards. Accordingly, this Court DENIES plaintiff's request to reverse the Commissioner's decision and to award plaintiff SSI. This Court DIRECTS the Court's clerk to enter judgment in favor of defendant Jo Anne B. Barnhart, Commissioner of Social Security, and against plaintiff Martain M. Jordan and to close this action.

IT IS SO ORDERED.

**Dated:      November 22, 2006**                     _____/s/ Lawrence J. O'Neill_____
66h44d                                               UNITED STATES MAGISTRATE JUDGE